IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| CELISTER HATCHER, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 2:25-cv-00023-KD-B |
| ) | |
| ALLSTATE VEHICLE AND ) | |
| PROPERTY INSURANCE COMPANY, ) | |
| Defendant. ) | |

### ORDER

This action is before the Court on the Motion to Exclude the Testimony of Plaintiff's Expert Witnesses and the Motion for Summary Judgment filed by Defendant Allstate Vehicle and Property Insurance Company ("Allstate"). (Docs. 24, 25). Upon consideration, and for the reasons below the motion to exclude is **GRANTED in PART**, and the motion for summary judgment is **GRANTED in PART**.

I.   FINDINGS OF FACT[1]

Plaintiff Celister Hatcher ("Plaintiff" or "Hatcher") owned a home located at 125 Barker Street, Selma, Alabama 36701 (the "Property"). Hatcher had an Allstate House & Home Policy, policy number 995281220 (the "Policy") that was in force and effect on January 12, 2023. (Doc. 22-1). On January 12, 2023, the Property was damaged by a tornado. The same day, Hatcher's wife[2] notified Allstate of the tornado, and the insurance claim was initiated. (Doc 22-3 at 68–72). Allstate

---

[1] The "facts," as accepted at the summary judgment stage, "may not be the actual facts of the case." Feliciano v. City of Miami Beach, 707 F.3d 1244, 1247 (11th Cir. 2013).

[2] During the pendency of the insurance claim, the Hatchers were in the process of divorcing. Communication to and from Allstate was made to both one or the other of the Hatchers during the claim process—as shown by Allstate's claim notes. As part of the divorce decree, Ms. Hatcher forfeited her rights to this claim to Mr. Hatcher. (Doc. 22-2 at 12).

began investigating the claim and scheduled an inspection of the property, which took place on January 23, 2023. (Doc. 22-3 at 6, 263).

On January 25, 2023, Allstate sent a letter to Hatcher with reference to the insured's duties under the Policy. (Doc. 22-3 at 3).[3] The letter stated in pertinent part:

> 3. What You Must Do After A Loss
>
> In the event of a loss to any property that may be covered by this policy, you must:
> . . .
>
> f) as often as we reasonably require:
>
>> 1) show us the damaged property. We have a right to reasonable and safe opportunities to view and inspect the loss as often as necessary, unimpeded by actions of you or others, including, but not limited to, civil, governmental or military authorities, that prevent us from viewing and inspecting the loss. We may require you to accompany us when we conduct these activities.
>
> . . .
>
> We have no duty to provide coverage under this section if you, an insured person, or a representative of either fail to comply with items a) through g) above, and this failure to comply is prejudicial to us.

(Doc. 22-3 at 3–4) (citing Doc. 22-1 at 37–38).

On February 9, 2023, Allstate completed its estimate, which included the following benefits owed: $41,204.81 Actual Cash Value ("ACV") for the dwelling and $4,392.22 (ACV) for the shed. (Doc. 22-3 at 6–8). Allstate issued these payments on February 10, 2023. (Id. at 10).[4] Multiple times, Allstate's adjuster explained the supplemental claims process to Hatcher and/or his wife. (Doc. 22-3 at 61–65). The adjuster also explained that Hatcher needed to submit a contractor's

---

[3] Hatcher admits that Allstate sent the letter, but he does not recall receiving the letter. (Doc. 29 at 1) (citing Doc. 29-1 at 3).

[4] Hatcher admits that he understood these payment amounts to be the amounts that Allstate believed it owed. (Doc. 22-2 at 2).

estimate to support any supplemental payments. (Id.). A portion of one of the claim notes dated March 10, 2023, follows:

> Spoke with insured Mr. Hatcher . . . . Explained that [Hatcher] needs to hire a contractor to come out and inspect the property and write an estimate for repairs to submit to [Allstate] for review to address any supplements if needed. Explained to Hatcher that once he has a contractor, if the contractor brings up concerns regarding structural integrity of the house at that time we will need documentation from him supporting his concerns and we will proceed from there. . . .

(Doc. 22-3 at 64).[5]

On April 17, 2023, Allstate received an email from Hatcher. (Doc. 22-3 at 60). Attached to the email was a one-page report from structural engineer Stuart Ashley ("Ashley"). (Doc. 22-3 at 45). Ashley's report indicated that he inspected the home on April 16, 2023, and that "a thorough inspection of the structure could not be achieved due to the debris, but with the age of the home, the condition of the structure, and with the obvious failures that still exist, this home is not inhabitable and is in irreparable shape." (Id.). Ashley's report concluded that "this home is considered to be completely destroyed" and "must be demolished." (Id.).

On April 18, 2023, Allstate emailed Hatcher to confirm receipt of Ashley's report. (Doc. 22-3 at 59). Allstate's email explained: "If your property is a total loss, we will need you to send in a contractor estimate." (Id.).

On May 10, 2023, Hatcher emailed Allstate an estimate to rebuild his home. (Doc. 22-3 at 56). The estimate was prepared by Cagle and Luster Construction Inc. (Doc. 22-3 at 9). The estimated cost to rebuild the home was $225,000. (Id.). The estimate price "was based on another home

---

[5] Hatcher admits that these statements were made, and Hatcher admits that he knew he should submit a contractor's estimate if he disagreed with Allstate's estimate. (Doc. 29 at 2). But Hatcher contends that Allstate "has not identified any policy provision requiring such process for payment because none such requirement exists in the insurance policy." (Id.).

presently being built . . . similar to" Hatcher's home. (Id.). The estimate did not include a breakdown of specific costs.

On June 29, 2023, Allstate adjuster Breanna Simmons spoke with contractor Sammy Luster on the phone. (Doc. 22-3 at 55). Simmons explained to Luster that Allstate needed "more of a breakdown of the numbers." (Id.). [6] No breakdown was provided. On July 13, 2023, Hatcher spoke with Breanna Simmons over the phone. (Doc. 22-3 at 54). Hatcher stated that he had another contractor coming out that morning, and he would be sending in an estimate as soon as possible. (Id.).

On August 18, 2023, Hatcher sent Allstate an estimate from Rachlin "Charles" Grant ("Grant"). (Doc. 22-3 at 53). Grant's estimate to rebuild the home totaled $255,00.57. (Doc. 22-3 at 12–16). The estimate included a breakdown of specific costs.

On August 21, 2023, Allstate emailed Hatcher's wife to schedule an additional inspection of the property on September 4, 2023. (Doc. 22-3 at 52). Two days later, Allstate sent a letter confirming this inspection date. (Doc. 22-3 at 20).

When the Allstate inspector arrived for the additional inspection, he found the house completely demolished. (Doc. 22-3 at 50). Hatcher admits that he never gave Allstate notice that he was demolishing the house. (Doc. 22-2 at 10). The house was demolished by Grant. (Doc. 22-4 at 7; Doc. 29-1 at 4). Hatcher contends that he never authorized the demolition of the house, but Grant's testimony disputes this. (Id.). Specifically, Grant's testimony indicates that Hatcher "certainly told [Grant] to tear the house down." (Id. at 7). According to Grant, Grant and Hatcher

---

[6] Hatcher admits that Simmons asked Luster for a better breakdown of the numbers. (Doc. 29 at 2). But Hatcher contends that Allstate "has not identified any policy provision requiring such process for payment because none such requirement exists in the insurance policy." (Id.).

4

texted about the demolition of the house on August 16, 2023. (Id. at 5). Grant recalls the demolition occurring the week following their discussion on August 16, 2023. (Id.).

On October 2, 2023, an Allstate representative had a call with Hatcher and advised him that because the property was demolished, no supplemental review could be completed for any potential further payment on the claim. (Doc. 22-3 at 46–48).[7]

On November 6, 2023, Allstate received an email from Hatcher's counsel Rickman Williams ("Williams"). (Doc. 22-3 at 24). The email included photographs of the home and another report from Grant. (Doc. 22-3 at 25–38). This report from Grant explained that he recommended the house be "completely rebuilt due to safety concerns and repair costs exceeding the value of the house itself." (Id. at 25). The report included an estimate with a breakdown of costs that totaled $156,150. (Id. at 27).

On December 5, 2023, Allstate sent Williams a denial letter stating Allstate's position that it believed the loss has been addressed correctly. (Doc. 22-3 at 39). On April 22, 2024, Allstate received an appraisal demand from Hatcher's new counsel Smith Prestwood ("Prestwood"). (Doc. 22-3 at 40). On May 1, 2024, Allstate emailed Prestwood requesting a demand or an "estimate to verify what is being disputed." (Id. at 41). The same day, Prestwood clarified that the dispute was the difference between the contractor's repair estimate that was previously provided to Allstate by Hatcher and the repair estimate that Allstate prepared. (Id. at 42). On May 14, 2024, Allstate sent a letter to Prestwood denying appraisal because "causation and scope of covered damages are not appraisable issues in Alabama." (Id. at 43–44).

---

[7] Hatcher admits that this call occurred but contends that Allstate "has not identified any policy provision requiring such 'supplemental review' procedure for payment because none such requirement exists in the insurance policy." (Doc. 29 at 2–3).

5

On December 13, 2024, Hatcher sued Allstate in the Circuit Court of Dallas County, Alabama. (Doc. 1-1). A month later, Allstate removed the action based on diversity jurisdiction. (Doc. 1).

## II.  MOTION TO EXCLUDE EXPERT WITNESSES

Allstate moves to exclude the estimates, reports, and testimony of Hatcher's experts Jason Nezat ("Nezat"), Rachlin Charles Grant ("Grant"), and Stuart Ashley ("Ashley"). (Doc. 24). This motion is known as a Daubert motion. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). "If proffered expert testimony fails to cross Daubert's threshold for admissibility, a district court may exclude that evidence from consideration when passing upon a motion for summary judgment." Cortes-Irizarry v. Corporacion Insular De Seguros, 111 F.3d 184, 188 (1st Cir. 1997). Therefore, the Court will address these issues before considering the motion for summary judgment.

### A.  Standard of Review

Federal Rule of Evidence 702 governs the admission of expert testimony and "the form in which that testimony may be given." 29 Wright & Miller's Federal Practice & Procedure Evidence § 6263 (2d ed. 2025). Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. The trial court's role under Rule 702 is that of a gatekeeper. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 588, 597 (1993); United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). The objective of the gatekeeping requirement "is to ensure the

reliability and relevancy of expert testimony." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999).

However, "it is the not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596. "Indeed, 'in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.'" Rosenfeld v. Oceania Cruises, Inc., 654 F.3d 1190, 1193 (11th Cir. 2011) (quoting Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1188 (9th Cir. 2002)).

"[T]rial courts determining the admissibility of expert testimony under Federal Rule of Evidence 702 must 'engage in a rigorous three-part inquiry.'" Rosenfeld, 654 F.3d at 1193 (quoting Frazier, 387 F.3d at 1260). *First*, the court must determine that "the expert is qualified to testify competently regarding the matters he intends to address." Frazier, 387 F.3d at 1260. *Second*, the court must determine that "the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert." Id. *Third*, the court must determine that "the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." Id.

Courts should take care not to conflate these three inquiries: qualification, reliability, and helpfulness. Rosenfeld, 654 F.3d at 1193. The proponent of the expert testimony bears "the burden of establishing qualification, reliability, and helpfulness." Frazier, 387 F.3d at 1260. This burden must be shown by a preponderance of the evidence. Cook ex rel. Est. of Tessier v. Sheriff of

7

Monroe Cnty., Fla., 402 F.3d 1092, 1107 (11th Cir. 2005). "The district court has 'broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is manifestly erroneous.'" Guidry-Davis v. State Farm Fire & Cas. Co., 713 F. Supp. 3d 1190, 1199 (S.D. Ala. 2024) (quoting Evans v. Mathis Funeral Home, 996 F.2d 266, 268 (11th Cir. 1993)).

### B. Analysis

The Court must analyze the qualifications, reliability, and helpfulness of each expert that Allstate moves to exclude. Hatcher bears the burden of proof on each of these inquiries. Allstate does not challenge the qualifications of any of the experts it moves to exclude. At this stage, a review of their qualifications and experience establishes that they are qualified experts.[8] Therefore, the only issues are (1) whether their disputed testimony is reliable and (2) whether their disputed testimony is helpful to the jury.

#### 1. Jason Nezat's Opinions and Reports

Allstate argues that Nezat's opinions and reports are due to be excluded because Nezat's "estimate of the cost to rebuild Plaintiff's dwelling and shed is based on an unreliable method, that being he prepared an estimate based on speculation and assumption of what an inspection or other photographs may have shown." (Doc. 24 at 5). In support, Allstate argues that Nezat did not inspect the property and that Nezat did not see the entire dwelling. (Id.). Allstate quotes portions of Nezat's testimony related to dwelling damages where Nezat admitted that certain estimates were based on speculation and/or assumption. (Id. at 5–7). And Allstate argues that several items in Nezat's estimate "are simply wrong or have been overscoped." (Id. at 9) (addressing the window damage).

---

[8] Specifically, the Eleventh Circuit has called Nezat "a qualified expert in the field of insurance adjusting." First Baptist Church of Lillian, 2024 WL 1548904, at *5. Rachlin Grant's opinion letter states that he is a homebuilder and general contractor licensed in Alabama. (Doc. 24-1 at 45). And Stuart Ashley is a professional engineer licensed in Alabama. (Doc. 24-3 at 19).

Hatcher responds by arguing that "Nezat is a highly qualified expert in the field of insurance adjusting whose opinions have supported a jury verdict before this Court and have been upheld before the Eleventh Circuit." (Doc. 28 at 2) (citing First Baptist Church of Lillian v. Church Mut. Ins. Co., No. 23-12834, 2024 WL 1548904 (11th Cir. Apr. 10, 2024)). Hatcher argues that Allstate "has offered no case law or other standard to suggest that a damages expert must inspect the damaged property to render an opinion." (Id.). And Hatcher points out that Allstate has also disclosed a damages expert that did not inspect the property. (Id.).

Hatcher argues that Nezat's failure to personally inspect the property before it had been demolished is not sufficient grounds to exclude his opinions and report. (Doc. 28 at 2). Hatcher supports this position with caselaw from this district explaining that "[t]he fact that an expert does not personally inspect the scene of an incident is not by itself determinative; personal inspections are not a black letter requirement." Guidry-Davis v. State Farm Fire & Cas. Co., 713 F. Supp. 3d 1190, 1200 (S.D. Ala. 2024). And Hatcher argues that "Nezat based his repair estimate on his review of the Allstate estimate, the Allstate photographs, and information from the Plaintiff." (Doc. 28 at 2). Hatcher also supports the specific opinions that Allstate attacks by citing other portions of Nezat's testimony and photographic evidence. (Id. at 3–4). Hatcher concludes by arguing that although "a few (less than 10) items in [Nezat's] 379 line item estimate could be wrong," the entirety of Nezat's testimony should not be excluded. (Id. at 5).

In reply, Allstate argues that Hatcher "incorrectly reframe[d] the issue as to why Allstate moved to exclude" Nezat's testimony. (Doc. 31 at 1). Allstate argues that it moved to exclude Nezat's testimony because it is based on assumption and speculation—not because Nezat did not personally inspect the property. (Id.). Allstate distinguishes its expert who did not inspect the property because its expert "did not prepare an estimate of repair, but instead gave his opinions as

9

to whether the estimate by the Allstate adjuster was correct based on the photos taken by the adjuster." (Id. at 2). Allstate concludes that "Nezat's estimate is unreliable and would not help the trier of fact because he was forced to assume and speculate for repairs when there simply was no evidentiary basis for his opinion." (Id. at 3).

Allstate seeks to exclude Nezat's estimate because it contains Nezat's assumptions and speculations. But an estimate is itself a "rough or approximate calculation." Estimate, Meriam–Webster, https://www.merriam-webster.com/dictionary/estimate (last visited Dec. 8, 2025). And Nezat's estimate was based on his expert review of the Allstate estimate, the Allstate photographs, and information from Hatcher. The fact that Nezat had to make assumptions or speculations based on that data does not make his estimate unreliable. See Woienski v. United Airlines, Inc., 383 F. Supp. 3d 1342, 1348 (M.D. Fla. 2019) ("[A]n expert is permitted to form conclusions by extrapolating from existing data.").

Of course, an expert relying on experience must support his conclusions with reasons and facts. Id. But Nezat provided support for each of his assumptions and/or speculations attacked by Allstate. (Doc. 28 at 3–4) (citing Nezat's testimony and the photographs upon which he relied). As for the windows, however, Nezat conceded that "it would be fair" for him "to take out replacing all the windows other than the one damaged" as shown in the Allstate photographs. (Doc. 24-2 at 10). With the exception of the windows, the rest of Nezat's opinions and reports appears reliable and helpful to the jury.

2. **Rachlin Charles Grant's Opinions and Estimates**

Allstate argues that "Grant's estimate and testimony should be excluded because they are not reliable, relevant or helpful to the trier of fact." (Doc. 24 at 10). Specifically, Allstate argues that Grant's opinion that the home is unsalvageable contradicts his other report and testimony

10

indicating that the home could be rebuilt. Moreover, Allstate argues that Grant's estimate and testimony are unreliable because Grant did not estimate the cost of rebuilding Hatcher's exact house. Instead, Grant estimated the cost of rebuilding a house that is roughly the same size.

Hatcher responds by arguing that the fact that "Grant provided estimates for both repair and replacement of the home may be material for cross examination, [but] it is not a basis for excluding his opinions." (Doc. 28 at 5). Hatcher points out that Grant's opinion that the home should be demolished and replaced is supported by the opinion of Stuart Ashley. (Id.) (citing Docs. 24-1 at 45; Doc. 24-3 at 19). Hatcher argues that Grant's replacement estimate is reliable because it details "various trade components of the rebuild." (Id.). Hatcher acknowledges that Grant's estimate is not organized in the same fashion as Allstate's Xactimate estimate, but Hatcher argues that "Allstate has cited no requirement in the insurance policy or Alabama law that benefits are only payable based on an estimate prepared in Xactimate." (Id.). In support of Grant's estimate, Hatcher cites Alabama caselaw suggesting that "a jury need not achieve 'mathematical precision'" in computing damages for breach of contract. (Id. at 6) (quoting Mannington Wood Floors, Inc. v. Port Epes Transp., Inc., 669 So. 2d 817, 822 (Ala. 1995)).

In reply, Allstate argues that its adjuster completed his estimate based on the specifics and uniqueness of Hatcher's house. (Doc. 31 at 4). Allstate argues that allowing "Grant to testify as to the cost to rebuild any house similar to the size of [Hatcher's] house would serve to confuse the jury." (Id.). And Allstate argues that "[a]llowing Grant to testify as to the cost to rebuild a house that has no similarities to Hatcher's house other than the overall size is not a reliable method to prove that Allstate's estimate" is too low. (Id.).

11

Upon review, the Court is satisfied that Grant's testimony and reports are reliable and helpful to the jury. Allstate's objection to Grant's opinions and estimates may be addressed on cross examination.

### 3. Stuart Ashley's Opinions and Report

Allstate argues that Ashley's opinions and report should be excluded as unreliable and unhelpful. (Doc. 24 at 12). In support, Allstate argues that Ashley did not perform a structural inspection, that Ashley did not go inside the home or on the roof, and that Ashley did not see the home until approximately four months after it was damaged. Allstate argues that Ashley conceded that the delay would have caused the home to be in a worse condition than if repairs were made earlier. And Allstate argues that Ashley's one page report and opinions are obviously based on an unreliable method.

Hatcher responds by arguing that Ashley testified that his observations were sufficient to support his opinions to a reasonable degree of engineering certainty. (Doc. 28 at 6) (citing Doc. 28-3 at 6). Hatcher argues that Ashley inspected the home from the exterior because scattered debris prevented Ashley from accessing the interior of the home. (Doc. 28 at 6) (citing Doc. 24-3 at 19). In support, Hatcher cites pictures of the damage that allow "even a layman to understand" Ashley's opinion. (Id.). Hatcher also explains that Ashley's delay in his inspection was only three months and four days after the tornado. Hatcher argues that Allstate's timing argument is misplaced because Ashley testified that there is nothing Hatcher could have done to stop additional damage. (Id. at 7) (citing Doc. 28-3 at 5–6). And Hatcher argues Ashley's opinions would be relevant because the additional damage—as a result of the tornado—would be covered under the policy.

In reply, Allstate argues that Ashley "did absolutely nothing other than look at the house from the outside from the ground and made a determination that [Hatcher's] home was unsalvageable and would have to be completely rebuilt." (Doc. 31 at 4–5). Allstate contends that "Ashley's testimony would be confusing to the [jury] in that he is cloaked with the expertise of a structural engineer but did nothing that a structural engineer should do to determine whether a structure that is still standing is unsalvageable." (Id. at 5). Allstate also argues that the timing of Ashley's inspection makes it unreliable because the real issue is the condition of Hatcher's home at the time Allstate performed its inspection, which was shortly after the tornado damage.

An expert's testimony must be "based on sufficient facts or data" and "the product of reliable principles and methods," and the expert's opinion must reflect "a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(c). Here, Allstate argues that Ashley's report is unreliable because Ashley did not enter the home or go on the roof and because Ashley did not perform a structural inspection. Ashley's report twice indicates that he could not perform "a thorough inspection" because of "the volume of scattered debris within the home." (Doc. 24-3 at 19). Ashley admits in his deposition that his conclusion was reached without entering the home and that he "physically could not" do a true structural inspection. (Doc. 24-4 at 5). However, the Court is not convinced that the report should be excluded.

"The rejection of expert testimony is the exception rather than the rule." Moore v. Intuitive Surgical, Inc., 995 F.3d 839, 850 (11th Cir. 2021) (quoting Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments). "[C]ourts must remain chary not to improperly use the admissibility criteria to supplant a plaintiff's right to a jury trial: 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" Id. (quoting Daubert, 509

13

U.S. at 596). The Court is satisfied that any weaknesses in the basis of Ashley's opinion may be adequately addressed at cross examination.

*****

A summary of the rulings on Allstate's motion to exclude expert testimony follows:

- The motion to exclude Jason Nezat's opinions and reports is **GRANTED in PART**. Only Nezat's estimates on the window damage are excluded.

- The motion to exclude Rachlin Charles Grant's opinions and estimates is **DENIED**.

- The motion to exclude Stuart Ashley's opinions and reports is **DENIED**.

### III. MOTION FOR SUMMARY JUDGMENT

Allstate moves for summary judgment on the three causes of action in Hatcher's complaint. (Doc. 25). Count One alleges that Allstate refused to submit to appraisal. (Doc. 1-1 at 2). Count Two alleges that Allstate breached its insurance contract with Hatcher. (Id.). Count Three alleges that Allstate acted in bad faith by breaching the contract without a reasonably legitimate or arguable reason. (Id. at 3). Based on the Court's findings on the Daubert motion, the Court will consider the expert testimony of Nezat, Grant, and Ashley admissible—apart from Nezat's window damage estimate.

### A. Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome" of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a genuine dispute of material fact exists. Id.

The party moving for summary judgment "bears the initial burden of demonstrating the absence of a genuine dispute of material fact." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d

14

1282, 1307 (11th Cir. 2011). The movant meets this burden by identifying affirmative evidence (pleadings, depositions, answers to interrogatories, admissions on file, etc.) to support its claim that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A). If the nonmovant bears the burden of persuasion at trial, the movant may also make a prima facie showing of summary judgment by demonstrating that the nonmovant's evidence is insufficient to establish an essential element of its claim. Grange Mut. Cas. Co. v. Slaughter, 958 F.3d 1050, 1057 (11th Cir. 2020); Fed. R. Civ. P. 56(c)(1)(B).

If the movant meets its burden under Rule 56(c), summary judgment will be granted unless the nonmovant offers some competent evidence that could be presented at trial showing that there is a genuine dispute of material fact. Celotex, 477 U.S. at 324. If the movant met its burden by pointing "to specific portions of the record . . . to demonstrate that the nonmoving party cannot meet its burden of proof at trial," the nonmovant must "go beyond the pleadings" to designate specific facts showing a genuine issue for trial. Id.; Fed. R. Civ. P. 56(e).

When assessing a summary judgment motion, the court's function is not to make "credibility determinations" and "weigh the evidence." Anderson, 477 U.S. at 248. Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." FindWhat, 658 F.3d at 1307. Thus, summary judgment is only proper when a movant shows that no reasonable jury could find for the nonmovant—even when the evidence and inferences are drawn in the nonmovant's favor.

**B. Applicable Law**

Absent a choice of law provision, federal courts in diversity actions must apply state substantive law and the conflict-of-laws rules of the forum state. Erie R.R. v. Tompkins, 304 U.S. 64 (1938); Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941). In this diversity action, the

parties did not cite to a choice of law provision in the policy. Alabama is the forum state. Thus, Alabama's conflict-of-laws rules apply.

In Alabama, the "doctrine of *lex loci contractus* governs the validity, interpretation, and construction of the contract." Colonial Life & Acc. Ins. Co. v. Hartford Fire Ins. Co., 358 F.3d 1306, 1308 (11th Cir. 2004). This means that "a contract is governed by the laws of the state where it is made except where the parties have legally contracted with reference to the laws of another jurisdiction." Cherry, Bekaert & Holland v. Brown, 582 So. 2d 502, 506 (Ala. 1991). Here, the dispute involves a contract. Neither party disputes that the contract was made in Alabama. Allstate's motion relies on Alabama caselaw. Hatcher cites no legal authority in response. Accordingly, the Court presumes that Alabama law applies to interpretation of the policy.

### C. Analysis

Hatcher concedes to summary judgment on the claim to compel appraisal (Count One). (Doc. 29 at 3). No genuine dispute of material fact exists on this claim, so Allstate is entitled to summary judgment as to Count One. The remaining issues are (1) whether Allstate is entitled to summary judgment on Hatcher's breach-of-contract claim and (2) whether Allstate is entitled to summary judgment on Hatcher's bad-faith claim.

#### 1. Breach of Contract

"The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages." Dupree v. PeoplesSouth Bank, 308 So. 3d 484, 490 (Ala. 2020) (quoting Shaffer v. Regions Fin. Corp., 29 So. 3d 872, 880 (Ala. 2009)). "However, where a party fails to comply with a condition precedent to recovery under a contract, said party cannot sustain

a breach of contract claim." Guidry-Davis v. State Farm Fire & Cas. Co., 713 F. Supp. 3d 1190, 1202 (S.D. Ala. 2024).

Allstate argues that it is entitled to summary judgment on the breach-of-contract claim because "Hatcher failed to comply with the Policy's post-loss requirement of making the dwelling available for inspection as often as necessary." (Doc. 25 at 11). Allstate cites Alabama caselaw for the proposition that a contract is not effective until certain specified conditions are performed. (Id.) (citing Ex parte Payne, 741 So. 2d 398, 403 (Ala. 1999)). Allstate then points to a Policy provision that it argues contain a "clear and unambiguous" post-loss condition. (Doc. 25 at 11). The provision—which is under the title of "**Section I Conditions**" and subtitled "**What You Must Do After A Loss**"—reads:

> In the event of a loss to any property that may be covered by this policy, **you** must
> . . .
> show **us** the damaged property. **We** have a right to reasonable and safe opportunities to view and inspect the loss as often as necessary, unimpeded by actions of **you** or others … that prevent us from viewing and inspecting the loss.
> . . .
> **We** have no duty to provide coverage under this section if **you**, an **insured person**, or a representative of either fail to comply with [this provision] and this failure to comply is prejudicial to **us**.

(Doc. 22-1 at 37–38).

Allstate contends that Hatcher failed to comply with this post-loss requirement of making the damaged property available for inspection by Allstate as often as necessary when he had "his dwelling demolished." (Doc. 25 at 11–12). More specifically, Hatcher's "action prohibited Allstate from reinspecting the dwelling after receipt of [Hatcher's] estimate." (Id. at 12). In further support, Allstate quotes numerous Alabama state and federal courts that "have vigorously enforced an insured's post-loss duties" under insurance policies. (Id.).

17

In response, Hatcher argues that Allstate's breach of contract claim does not fail because (1) Allstate's request for reinspection was unreasonable, (2) Allstate was aware of the demolition per adjuster Breanna Simmons, (3) Allstate's failure to reinspect was not caused by the insured or its representative, and (4) Allstate was not prejudiced by the failure to reinspect. (Doc. 29 at 4).

Viewing the evidence in the light most favorable to Hatcher, the Court finds that there are issues of fact precluding summary judgment on the breach-of-contract claim. Specifically, whether the timing of Allstate's reinspection request complied with the Policy's reasonability requirement and whether Allstate was prejudiced by the failure to reinspect are issues for the jury. The reinspection request was made seven months after the tornado damage and four months after Allstate received Ashley's report declaring the home to be unsalvageable. Moreover, Allstate possessed its initial inspection report—and several reports sent by Hatcher—before the house was demolished. A reasonable jury could find that Allstate failed to comply with its own Policy requirement or that Allstate was not prejudiced by the failure to reinspect. Thus, Allstate is not entitled to summary judgment on the breach-of-contract claim.

2. **Bad Faith**

Under Alabama law, "[t]he tort of bad faith consists of the following essential elements: (1) a breach of an insurance contract; (2) a refusal to pay the claim; (3) the absence of an arguable reason for failing to pay; and (4) the insurer's knowledge of such an absence." Walker v. Life Ins. Co. of N. Am., 59 F.4th 1176, 1186 (11th Cir. 2023). "If a plaintiff is traveling under the failure-to-investigate theory—and thus is bringing an 'abnormal' bad-faith claim—there is another essential element: (5) 'the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.'" Id. (quoting State Farm Fire & Cas. Co. v. Brechbill, 144 So. 3d 248, 258 (Ala. 2013)). "To be clear, '[r]egardless of whether the claim is a bad-faith refusal to

pay or a bad-faith refusal to investigate, the tort of bad faith requires proof of the third element[:] absence of a legitimate reason for denial.'" Id. (alteration in original) (quoting Brechbill, 144 So. 3d at 258).

Allstate argues that it is entitled to summary judgment on the bad-faith claim because (1) Allstate did not breach the insurance contract and (2) Hatcher cannot produce any evidence to establish the lack of a reasonable and legitimate basis for Allstate to not pay the amount demanded, (Doc. 25 at 18). In support, Allstate cites Alabama caselaw for the proposition that a "plaintiff asserting a bad-faith claim bears a heavy burden." Shelter Mut. Ins. Co. v. Barton, 822 So. 2d 1149, 1154 (Ala. 2001). Allstate also cites Alabama caselaw explaining that the existence of a debatable reason for the failure to pay or the failure to investigate a claim forecloses a claim of bad faith. See State Farm Fire & Cas. Co. v. Brechbill, 144 So. 3d 248, 259 (Ala. 2013).

In response, Hatcher "acknowledges that a simple dispute in estimating damages generally does not qualify as bad faith." (Doc. 29 at 6). But Hatcher argues that "Allstate's refusal to issue additional payments on the claim was not the result of an estimate dispute." (Id.). Hather argues that Allstate's failure to reinspect is not a basis to deny further payment, and Hatcher argues that Allstate acted in bad faith by refusing to reconcile all the information it had.

Hatcher's bad-faith claim fails as a matter of law because Hatcher cannot establish the absence of an arguable reason for Allstate's denial or refusal to investigate. Under either theory, a bad-faith claim will fail unless the plaintiff proves "a *bad faith* nonpayment," which is "a nonpayment without any reasonable ground for dispute." Walker, 59 F.4th at 1186 (quoting Nat'l Sec. Fire & Cas. Co. v. Bowen, 417 So. 2d 179, 183 (Ala. 1982)). "Alabama courts limit bad faith claims to cases where the underlying breach of contract claim is so strong the plaintiff is due a directed verdict." Allen v. USAA Cas. Ins. Co., 668 F. Supp. 3d 1237, 1242 (N.D. Ala. 2023) (quoting

19

Barnett v. Sun Life Assurance Co. of Canada, 2022 WL 4596567, at *5 (N.D. Ala. July 18, 2022)). "In other words, if there is a genuine dispute of material fact on the breach of contract claim, the bad faith claim must fail." Id. (quoting Barnett, 2022 WL 4596567 at *5).

Here, neither party is entitled to summary judgment on the breach-of-contract claim. Put another way, there is a reasonable ground for dispute regarding Allstate's nonpayment. Therefore, Hatcher fails to prove the absence of a legitimate reason for Allstate's denial, and the bad-faith claim must fail as a matter of law.

### IV. CONCLUSION

Allstate's motion to exclude Hatcher's expert testimony, (Doc. 24), is **GRANTED in PART**. Only Nezat's estimates on the window damage are excluded.

Allstate's motion for summary judgment, (Doc. 25), is **GRANTED in PART** as follows:

- The motion for summary judgment is **GRANTED** as to Count One (compel appraisal) and Count Three (bad faith).

- The motion for summary judgment is **DENIED** as to Count Two (breach of contract).[9]

**DONE** and **ORDERED** this **5th** day of **January 2026.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

[9] The parties are reminded that the trial date is set for March 16, 2026, in **Selma, Alabama**.